THE TAX CASES UNDER THE ACT OF MARCH, 1841, CHAP. 23.—*December*, 1841.

The State has the power to exempt from taxation particular items of property, to the extent proposed in the act of March, 1841, chap. 23; as also in the charters of the *Baltimore and Susquehanna Rail Road Company*, act of 1827, chap. 172, sec. 20, and the *Philadelphia, Wilmington and Baltimore Rail Road Company*, act of 1831, chap. 296, sec. 19.

The 7th and 11th sections of the act of 1821, chap. 131, are to be regarded as securing the banks from further tax or charge for their franchise or banking privilege, but not as exempting the property belonging to such banks, or the shares of stock therein held by individuals, from taxation.

The property of a bank being represented by the shares of stock therein, both cannot be taxed; and therefore, when the tax is imposed on the stock in the hands of share holders, the property of the bank, real or personal, cannot also be taxed.

The stock of the banks in *Baltimore* in the hands of share holders was rightfully taxed, but the appeal tax court erred in taxing the real and personal property of the same banks.

The banks in the *city of Baltimore*, incorporated before and after the year 1821, are in the same condition, as to the exemption of the banking privilege from taxation—at all events, the act of 1835, chap. 142, must have relieved the case of all doubt as to the banks claiming under that law.

Non residents of the State are liable to the tax in respect of stock held in the banks of this State, as well as residents here.

It also results, that as the stock is the representative of the property of a company, the exemption of the one must be considered as the exemption of both, unless the exemption be made on the ground of selection, to show which is intended to be taxed to the exclusion of the other.

In the case of *The Baltimore and Susquehanna Rail Road Company*, act of 1827, chap. 72, sec. 20, the stock is expressly exempted, and the whole object would be defeated by taxing the property ; the mortgage executed to the State, cannot exempt the property mortgaged from taxation in the hands of the company mortgagor.

In the case of the *Philadelphia, Wilmington and Baltimore Rail Road Company*, the Legislature, by the same act (1831, chap. 296, sec. 19,) which exempts the stock, reserves the right to tax the fixed and permanent works of the company, the tax on the property thus excepted from the exemption is proper on the ground of selection.

The tax in that case has been imposed according to the exception ; the bed of the road, the rails, buildings and steam boat being within it ; the principle of valuation adopted is proper; taxing the buildings, steam boats and rails, as of the value they bear, irrespective of their being portions of a rail road, and taxing the land as land, and not as of increased value by reason of its being used as a rail road.

The charitable and literary institutions excepted in the act of 1841, are properly considered as exempted.

The exemption of the act of March, 1841, chap. 23, also protects from taxation all *"houses of public worship and burying grounds,"* but not bank stock or other property held by or in trust for religious institutions, whether incorporated or otherwise.

Shares in the hands of stockholders in the Insurance Companies being taxed, the stock held by the companies as part of their property cannot also be taxed.

A bank, as in the case of *The Farmers and Merchants Bank of Baltimore*, being the holder of its capital stock, is not liable to be taxed thereupon.

A mortgage in the hands of the mortgagee is liable to be taxed as an item of his property—though all his other property, a part of which was mortgaged, is also taxed, and he cannot claim to deduct the sum he owes, from the sum due to him on mortgage.

A literary institution whose property is exempt from taxation, confessing a judgment to enable the plaintiff in the judgment to borrow money for it, does not exempt such judgment in the hands of such plaintiff from being taxed. Protection to the institution, does not protect those who deal with it.

APPEALS in the tax causes under the act of March session, 1841, ch. 23.

By the act of 1841, chap. 23, an act for the general valuation and assessment of property in this State, and to provide a tax to pay the debts of the State.

It was enacted by the first section, "that all real and personal property in this State, all chattels real and personal, all goods, wares and merchandizes, and other stock in trade at home, or not permanently located elsewhere; the interest or proportion in all ships and other vessels, whether in or out of port owned by persons resident of this State; all debts secured by or due on judgment, decree, mortgage bond, bill of exchange, promissory note from insolvent debtors, (except debts due for goods sold and delivered after the passage of this act, and bank notes,) all stocks or shares owned by residents of this State in any bank, institution or company incorporated in other State or territory; all debts due to residents of this State by solvent debtors residing out of this State, except debts due for goods sold and delivered after the passage of this act; all investments in securities or stocks of other States, made or held by residents of this State; all public loans and stocks whatsoever (except those created or issued by the United States,) owned or held by residents of this State; all stocks or shares in any bank, institution or company incorporated by this State, and all other property of every description whatsoever, shall be valued agreeably to the directions of this act, and shall be chargeable according to such valuation with the public assessment; PROVIDED, that nothing herein contained, shall be construed to authorize the assessment of any tax upon—

1. Property belonging to the United States, to this State, or to any county or city in this State.

2. Nor to any incorporated, literary or charitable institution, nor county schools.

3. Nor houses for public worship or burying grounds.

4. Nor the crop and produce of lands in the hands of the producer, or his, her, or their agent.

5. Nor provisions for the use and consumption of the person to whom the same shall belong, or his or her family.

6. Nor plantation utensils.

7. Nor the working tools of mechanics and manufacturers, moved or worked by hand, and the produce of their respective occupations whilst in their possession, or the possession of their agents.

8. Nor wearing apparel.

9. Nor fish, at the time fishermen may be employed in catching, salting and packing the same, or while they remain in their possession, or that of their agents, unsold.

10. Nor to household manufactures.

11. Nor judgments, bonds, mortgages, promissory notes or *other securities,* belonging to any bank or other incorporated institution, the capital stock whereof is made subject to taxation by the provisions of this act.

12. Nor to any goods, wares, merchandizes or other property belonging to persons not residents of this State, in the hands of factors in this State, for sale.

By the 33rd section of this act, it was declared, that upon the argument of any appeal under this act, "neither party shall be permitted to discuss any point involving merely a question of value or of regularity, or any other question of fact merely which may appear to have been acted on by the levy court, commissioners or appeal tax court, as the case may be; but the proper subject matter of such appeal, shall be the right of the General Assembly to subject to valuation and assessment for the support of government, property which is hereby made subject thereto, and the right of the General Assembly to exempt from valuation and assessment, property which is hereby exempted, and to make such provision for such valuation, assessment and exemption as is herein prescribed, and the conformity or otherwise of valuation, decision or other proceeding objected against, with the provisions of this act."

Under this act, the appeal tax court of the city of Baltimore proceeded to value and assess the capital stock of the Union Bank of Maryland, and also to value and assess its real pro-

perty in this State, including the banking house of the said bank, and also its furniture and fixtures in the banking house. This bank held as proprietor, various houses and lots other than its banking house. It appeared from the record, that the stock of the said bank belonged in part to various persons not residents of the State of Maryland, but residents of other parts of the United States, and of foreign countries.

That another portion of said stock belonged to various citizens of this State, and to certain incorporated literary and charitable institutions, viz: the Baltimore Female Orphan Asylum; the Benevolent Society of Baltimore; the Marine Charitable Society; the Medical and Chirurgical Faculty of Maryland; the Baltimore General Dispensary, and the Saint Andrew's Society. From such assessments all the stockholders respectively, and the said Union Bank of Maryland, appealed to this court.

It also appeared, that certain stock held by the Baltimore Insurance Company, in the Mechanics Bank of Baltimore; in the Chesapeake Bank; in the Union Bank of Maryland; in the Merchants Bank of Baltimore:

That certain stock held by the Baltimore Fire Insurance Company, in the Mechanics Bank of Baltimore; in the Farmers and Merchants Bank; in the Bank of Baltimore; in the Union Bank of Maryland; in the Merchants' Bank, and in the Farmers and Planters Bank:

That certain stock held by the Chesapeake Bank of Baltimore, in the Mechanics Bank of Baltimore; in the Bank of Baltimore; and the Citizens Bank of Maryland; and in the Commercial and Farmers Bank of Maryland; in the Union Bank of Maryland; in the Merchants Bank:

That certain stock held by the Firemens Insurance Company.

The Maryland Insurance Company.

The Merchants Fire Insurance Company,

The Neptune Insurance Company.

The Patapsco Bank of Maryland.

The American Insurance Company.

16        v. 12

The Farmers and Planters Bank.

The Farmers and Merchants Bank.

The General Insurance Company.

The Maryland Insurance Company.

The Merchants Bank of Baltimore.

The Baltimore and Susquehanna Rail Road Company.

The Neptune Insurance Company.

The Powhattan Manufacturing Company.

The Western Bank.

The Baltimore Life Insurance Company.

The Union Insurance Company, and

· The American Life Insurance Company.

In the Mechanics Bank of Baltimore; the Farmers and Merchants Bank; the Marine Bank; the Chesapeake Bank; the Bank of Baltimore; the Citizens Bank of Baltimore; the Commercial and Farmers Bank; the Franklin Bank of Baltimore; the Union Bank of Maryland; the Merchants Bank; the Western Bank, and the Farmers and Planters Bank. The Farmers and Merchants Bank being holders of 1711 shares of its own stock:

Was valued and *refused to be taxed by the* appeal tax court aforesaid, and from which refusal, the State in the name of the said court, appealed to this court.

It further appeared by the record in these causes, that *George M. Gill* was assessed upon mortgages (an account of which he had rendered,) to amount of $7,000, from which he claimed to be exempt from taxation, because he owed a larger sum on mortgage, and that under the bill of rights he could only be taxed upon his actual worth, while in fact he was taxed upon all his real and personal property, including mortgages to him, without deduction for the sum due by him on mortgage, and from which he appealed to this court.

It also appeared from the same records, that *Charles F. Mayer* was assessed on debts due to him secured by mortgage of real property, and on bank stocks held by him, he contending that his mortgage claim was not taxable, the mortgagor being in respect of the mortgaged estate alone taxable. From this judgment of the appeal tax court of the city of Baltimore, he appealed to this court.

It also appeared as aforesaid, that the *Washington College* was assessed, on the college lot, buildings, and furniture, and that *Dr. Samuel K. Jennings,* who had a judgment against the said college, was also assessed. It was admitted that *Dr. Jennings* had advanced for the erection and furniture of the college about eleven thousand dollars, and to enable him to borrow money on the property of the institution, the professors of the college confessed the judgment to him, and he contended that the property being taxed, is as much, as in justice ought to be claimed, the judgment and the property on which it is dependent being identical. From this judgment the college and *Dr. Jennings* both appealed.

It also appeared as aforesaid, that the *Savings Bank of Baltimore* was in possession of certain bank stocks and other securities, viz : stocks in banks incorporated by this State, turnpike road stock and mortgages, which were assessed— the Savings Bank appealed.

It further appeared, that *Daniel Atler* and various other stockholders of the American Life Insurance and Trust Company, (an institution incorporated by the State of *Maryland,*) not residents in *Maryland,* were assessed upon their capital stock therein, from which they severally appealed.

It also appeared, that the *Philadelphia, Wilmington* and *Baltimore Rail Road Company,* were assessed by the commissioners of *Harford* county, viz : To the several parcels or tracts of land held and occupied by the said company from the *Gunpowder Falls* to the *Susquehanna river,* containing together 200 acres, valued at $2,000. To the houses and other improvements on the road, and at *Havre de Grace,* valued at $15,000. The rail road track within the limits of *Harford* county, valued at $95,000. The steam ferry boat at *Havre de Grace,* valued at $15,000 ; in all $127,000, on which the tax was levied under the act of 1841. The company appealed from said decision.

The resident and non-resident stockholders of the Farmers and Merchants Bank of Baltimore, and the said bank as in the case of the Union Bank of Maryland, were assessed, and appealed from the same to this court.

Similar appeals were taken by all the stockholders in the cases of

The Mechanics Bank of Baltimore.

The Bank of Baltimore.

The Marine Bank of Baltimore.

The Commercial and Farmers Bank of Baltimore.

The Citizens Bank of Baltimore.

The Merchants Bank of Baltimore.

The Farmers and Planters Bank of Baltimore.

The Western Bank, and

The Chesapeake Bank ; to this court.

These appeals were argued before BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, CHAMBERS and SPENCE, Judges.

In their argument, the Bill of Rights of Maryland and various acts of Assembly were referred to, viz :

*13th Section, Bill of Rights.*—That the levying taxes by the poll is grievous and oppressive, and ought to be abolished ; that paupers ought not to be assessed for the support of government; but every other person in the State ought to contribute his proportion of public taxes for the support of government, according to his actual worth in real or personal property within this State ; yet fines, duties or taxes may properly and justly be imposed or laid with a political view, for the good government and benefit of the community.

By the act of 1821, ch. 131, entitled, an act to incorporate a company to make a turnpike road from *Boonsborough* to *Hagerstown*, and for the extension of the charters of the several banks in the city of *Baltimore*, and for other purposes ; it was recited in the preamble to be the interest of the State, that a turnpike road leading from *Boonsborough* to *Hagerstown*, in *Washington* county, should be made, and it is represented to the Legislature that the banks hereafter mentioned are willing to make the same, if an extension of their several charters be granted to them as they were heretofore extended. Therefore, Be it enacted, &c., (after making provision for building the turnpike.)

7th section. That on, &c., and annually thereafter, the pres-

ident, directors and company of the aforesaid banks, shall pay to the Treasurer of the Western Shore of *Maryland*, the sum of twenty cents on every hundred dollars of the capital stock of each bank actually paid in, or which may hereafter be paid in, and any of the said banks neglecting to make such payment for the space of six months after the same shall have become payable, shall thereby forfeit their charters, which shall then be considered null and void, and no longer continue under the provisions of this act.

8th section. That the charters of such of the aforesaid banks as comply with the provisions and conditions of this act, shall be renewed and continued until the year 1845, &c.

9th section appropriated all sums of money received under this act, *to be a fund for the establishment of free schools.*

10th section pledged such funds inviolably for the establishment of a general system of free schools throughout the State.

11th section enacted, that upon any of the aforesaid banks accepting of and complying with the terms and conditions of this act, the faith of the State is hereby pledged not to impose any further tax or burthen upon them during the continuance of their charters under this act.

Act of 1831, chap. 296, sec. 19. Extract from the charter of *the Delaware and Maryland Rail Road Company*, made part of the charter of *the Philadelphia, Wilmington and Baltimore Rail Road Company.* "And the shares of the capital stock of said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen, by the State's assenting to this law, except upon that portion of the fixed works of said company which lie within the State of *Maryland*, and that any tax which shall hereafter be levied upon said section, shall not exceed the rate of any general tax which may at the same time be imposed upon similar real or personal property of this State for State purposes."

By the act of 1834, ch. 274, the acts incorporating the several banks in the city of *Baltimore*, whose charters were extended by the act of December session, 1821, chap. 135, were

upon their respective compliance with the provisions of this act, declared to be severally extended to wit, as follows, &c.

2nd section. That in order to their (the said banks,) respective enjoyment of the benefit of this act, the said corporations shall, on the first day of January in the year 1836, and annually thereafter, respectively pay to the Treasurer of the Western Shore, upon their respective capitals, now or that shall hereafter be paid in, the sum of twenty cents upon every hundred dollars of said capitals respectively ; and shall also pay to the Treasurer in two equal yearly instalments, computed from the passage of this act, their respective proportional parts according to and in the combined ratio of their respective capitals paid in, and of the time for which their charters are hereby respectively continued beyond the 1st day of January, 1845, the sum of $75,000, the aggregate of the assessments hereby fixed upon the capitals of the said corporations, it being however understood, that said charge of twenty cents upon said capital is not additional to the charge as prescribed by the 7th section of the act of 1821, chap. 131, as to the terms of said act.

3rd section. If any of said corporations shall fail to pay said charge of twenty cents on every hundred dollars, for the space of six months after the same shall be payable as aforesaid, this act as to the corporations so in default, shall be null and void.

4th section. Same as 3rd section in relation to non-payment of instalments under 2nd section.

SECTION 5. *And be it enacted,* That if any of said corporations shall, by or in any proceedings whatsoever, at law or in equity, attempt to call in question or to dispute, or to procure to be so called in question or disputed, the validity in any respect, or to any extent, of any acts that have been or may be passed, either during the present session or during any future session of the Legislature of *Maryland,* incorporating any bank within the limits of the city of *Baltimore,* or to attempt to restrain or in any wise interfere with the exercise of the corporate powers that shall be purported to be granted by any

such act of incorporation, then this act as to the said incorporation so attempting or procuring, shall be null and void.

Act of 1835, ch. 142, entitled, An Act relating to certain banks in the city of *Baltimore:*

WHEREAS, by the eleventh section of an act of Assembly, passed at December session in the year eighteen hundred and twenty-one, chapter one hundred and thirty-one, the faith of the State was pledged to certain banks in the city of *Baltimore*, upon certain terms and conditions therein specified, not to impose any further tax or burthen upon them during the continuance of their charters under that act ; and whereas, it is equitable that the banks subsequently chartered by the State of *Maryland*, should stand on equal footing with those banks—Therefore,

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That the faith of the State be, and it is hereby pledged, to impose no further or other tax or burthen upon any banks incorporated since the year eighteen hundred and twenty-one, or which may be hereafter incorporated, than such as may be expressed in their respective charters, and such as without violation of the pledge aforesaid, may be imposed on the banks which complied with the provisions of the aforesaid act of eighteen hundred and twenty-one.

SEC. 2. *And be it enacted,* That the municipal authorities of the city of *Baltimore*, shall not have power to impose or collect from any bank incorporated after the passage of the said act, or which may be hereafter incorporated, or upon the stock held therein, any tax which they may not lawfully, and shall not equally impose upon and collect from the banks, or upon the stock in the banks which have complied as aforesaid, with the terms and conditions of the said act of Assembly.

SEC. 3. *And be it enacted,* That in the said act of eighteen hundred and twenty-one, it was not, nor is it the intention of the General Assembly of *Maryland*, to exempt from taxation and equitable contribution, to the common burthens for State purposes, the property, stock or dividends severally held in or derived from any bank in this State, by any person or persons whatever, but that the true intent and meaning of the

pledge given by the said act of Assembly, was to limit the taxation upon the franchises only by the banks therein mentioned.

In the Court of Appeals the parties entered into the following agreement, to wit:

It is agreed that the appellant Banks, to wit:—The Union Bank of Maryland, The Bank of Baltimore, The Mechanics Bank of Baltimore, The Commercial and Farmers Bank of Baltimore, The Marine Bank of Baltimore, and The Farmers and Merchants Bank of Baltimore, commonly called the old Banks, were chartered previous to the year 1821; and that the new Banks, to wit:—The Merchants Bank of Baltimore, The Farmers and Planters Bank of Baltimore, the Citizens Bank of Baltimore, and the Western Bank of Baltimore, were chartered since the year 1830, the respective periods of the incorporation of all the aforegoing Banks appearing by reference to their charters.

It is admitted that the old Banks have duly accepted and complied with the terms and conditions of the act of 1821, chap. 131, the manner of which acceptance appears by the paper marked A, herewith filed; and have also accepted and complied with the provisions of the act of 1834, chap. 274; and it is also admitted, that taxes have always since the incorporation of said Banks been levied and assessed upon their real and personal property, in all the cities and counties of this State, in the same manner as upon property of the same kind belonging to individuals, and that said taxes have always been paid by said Banks, up to this time. And it is further admitted, that said Banks did not at the time of the enactment of the act of 1841, chap. 23, nor have they at any time since, paid or redeemed their notes or other obligations in specie.

> J. Meredith,
> G. L. Dulany, for Appellants.
> B. C. Howard,
> A. Constable,
> I. N. Steele, for Appellees.

DULANY on the part of the appellant Banks insisted—

1. That the old banks having accepted of, and complied with the terms and conditions of the act of 1821, chap. 131, a contract was created by the 11th section thereof on the part of the State "not to impose any further tax or burthen" upon said banks during the continuance of their charters under the 8th section of said act, and that this exemption from taxation extends to all the property of said banks, real and personal.

The act of 1841 is void as respects the old banks; it is in direct opposition to a contract entered into by the State with them. The State had agreed to impose no further burthens on them. She might lawfully make this contract, and for a consideration exempt them from taxation, and she cannot repeal the grant. *New Jersey vs. Wilson,* 7 *Cranch,* 164. *Ib.* 2 *Peter Con. Rep.* 457.

A partial release of the taxing power may be exerted for value. *Providence Bank vs. Billings and Pittman,* 4 *Peter,* 561.

The 11th section of the act of 1821 is a contract, and valuable to the State. A charter is a contract; a franchise is property. *Canal Co. vs. Rail Road Co.* 4 *G. & J.* 1. *Regents of University of Md. vs. Williams,* 9 *G. & J.* 365.

The banks had the power to contract with the State; they had a capacity to contract. What right does the contract bestow? What are the extent of its exemptions? The banks are entitled to the exemption. Its language is clear, brief and comprehensive. It is perfect and absolute in its terms. No further tax or burthen is to be imposed. The act of 1841 is a direct violation of the act of 1821. Light and darkness are not more opposed—one bestows an immunity, the other takes it away. It is in fact so clear, that it is difficult to make a question on it. It is said this exemption only applies to the franchise, but those words are not found in the law. The truth lays on the surface, and need not be burrowed for. For all rules of construction are out of this case; the words of the act are plain, unambiguous and of easy meaning. *Dwaris on Stat.* 40, 47.

The act of 1821 exempts the banks from further tax. The

act of 1841 imposes a tax of 20 cents in the hundred dollars. The exemption is general—no limitation, and the words must have some effect. After a franchise granted, it could not be taxed; once given, it cannot be re-called; but the power to tax is the power to destroy.

In this State no property is liable to taxation; persons are liable to be taxed in respect of property. 13th section of *Maryland* Bill of Rights. Property is referred to, to graduate the tax laid on the individual. Immunity from tax is itself a franchise and a personal privilege. The recitals of the preamble of the act of 1821, shows that it was merely to extend several charters. The preamble does not disclose the entire design of the contracting parties. The school fund and the exemption from further tax are not mentioned in it. The old banks are clear of the taxing power until 1845; and the act of 1841 is void as to them. Then who constitute the banks? Who the contracting parties to this agreement with the State? Who is exempted from burthens in futuro? The stockholders. A bank is neither separate from, exclusive, nor independent of its stockholders. A contract with the banks is necessarily one with their stockholders. The consideration is paid by them out of their funds, which entitles them to the exemption. The exemption under the act of 1821, is a personal franchise conferred on the contracting parties. It relates to the whole body of stockholders. The banks were required to accept the act of 1821, and until accepted by the proper party, no extension of their charters. Then who made the act of acceptance? Was it the banks as distinct from the stockholders? No, it was the stockholders as distinct from the bank. It was an acceptance by the assembled stockholders, which was acceptance by the banks. The Legislature has determined that the terms, bank and stockholders, as to this power, are identical. Where there is deliberate purpose to make a grant, it is construed most favorably for the grantee. 4 *G. & J.* A grant to a body is to all the members of it. *Providence Bank vs. Billings & Pittman,* 4 *Peters,* 562.

A tax upon the stock is a tax upon the social character. I maintain the banks cannot be taxed *œ nomine*, nor the stockholders, which are the bank.

2. That the 1st and 45th sections of the assessment act of 1841, chap. 23, does impose upon the old banks, a further tax and burthen, in violation of the said contract, and is therefore void as against the provisions of the Constitution of the United States.

3. That if the said assessment law, so far as it imposes a further tax upon the old banks, should be declared void, for the reason aforesaid, then the said act of 1841 is equally invalid, so far as it imposes an additional tax upon the new banks, as it thereby deprives the new banks of the immunity from further taxation, granted to them by the 1st section of the act of 1835, chap. 142—which immunity from further taxation is itself a franchise, and when once granted cannot again be taken away. But if it could, the appellants will further contend, that according to the true construction of the said acts of 1841 and 1835, it was not the design of the Legislature to burthen the new banks with any additional tax, which would not equally apply to the old ones.

The 3rd section of the act of 1835, is a legislative declaration after the contract made. That act is nugatory as to the act of 1821. No interpretation can be given by the Legislature to the act of 1821. That is a judicial power. The act of 1835 does not depart from the equity of 1821. It was not the design to tax the new banks—those created since 1821—if those prior could not also be taxed. *Canal Co. vs. Rail Road Co.* 4 *Gill & John.* 5.

4. That the imposition of a new tax of 20 cents on every one hundred dollars' worth of property, upon both the new and old banks, in addition to the tax heretofore paid by them, is unequal and oppressive, and in violation of the 13th section of the Bill of Rights.

This would make 40 cents in the hundred dollars to stockholders, while the rest of the community pay 20 cents. A double tax is unequal and unjust.

5. That the taxation of the stock of foreign or non-resident stockholders of said banks, is against the Bill of Rights, and therefore void.

This tax is against the 13th section of the Bill of Rights of Maryland. *Osborn vs. Inhabitants of Danvers*, 6 *Pick.* 100.

Both the person and property must be in the State before the taxing power attaches. *Great Barrington vs. County Commissioners of Berkshire*, 16 *Pick.* 572.

I. N. STEELE, Deputy Attorney General, CONSTABLE and HOWARD, for the Appeal Tax Court as appellee, contended—

1. That at the time of passing the general assessment law of 1841, there was no contract existing between the State and the banks or any of them, or the stockholders therein, or any of them, by which any of the banks or stockholders can claim an exemption from the taxation imposed upon them by the said act of 1841.

2. That the contract between the State and the old banks, if there be any contract, extends only to an exemption from further "taxes or burthens" of the corporate privileges of banking ; and does not exempt the property, either real or personal of said banks, or the individual stockholders therein.

The act of 1821 is a contract ; yet we construe it as a law ; or we construe it as a will ; we look to the law or the will for the intent. It is not to be construed most favorably for the grantee. In construing laws we have a right to look to the occasion which produced them ; the practice and usage under them. They are not to be enlarged by implication. Exemptions from taxes must arise from distinct legislative powers. *Providence Bank vs. Billings & Pittman*, 4 *Peters*, 560, 561. *Charles River Bridge vs. Warren Bridge*, 11 *Peters*, 546–7–8.

The taxing power is vital and essential to all communities. It is a power retained from necessity ; not to be surrendered nor yielded by implication. What is exempted and clearly given, is allowed, but no more. *Dartmouth College*, 4 *Wheat.* 699, 700. *Portland Bank vs. Apthorp*, 12 *Mass.* 252.

A consideration need not appear for a law passed in favor of a corporation.  *Ang. & Ames*, 265.   2 *Harr. & J.* 80.

In construing the act of 1821, and determining its nature, we may look back to the occasion of passing it.   8 *T. Rep.* 468, 472.   11 *John.* 77.   1 *N. Y. Laws*, 1801, 556.

The words, shall not be taxed by any law of this State, held in New York a total exemption from taxes.

But here the franchise only is exempted.   The word further in this act imports similarity.   It compels us to look back—no tax ejusdem generis can be laid.   1817, *chap.* 156.   4 *Wheat.* 316.   1835, *chap.* 142, *sec.* 2.   1821, *chap.* 192.

The act of 1834 is in effect a re-enactment of the act of 1821.   Two Legislatures granted the same privileges, on the same principles.

When before a charter expires, it is renewed or extended to a more distant period, from the moment it is accepted it is a new grant.   The old grant is merged, and the bank then exists under the new law.   Such was the effect of the act of 1834. It calls for a tax from the year 1836, though the banks existed under 1821 until 1845, and they are now paying under the act of 1834, what is called the school fund.

As to the 2nd branch of the 2nd point of the appellee, the right of the State to impose a tax on the stock of resident stockholders.   The same meaning is to be attached to the word bank in the 2nd and 11th sections of the act of 1821. The term bank, as there used, does not refer to stockholders. It treats with them in the aggregate as a bank, and so contracts with them.   7 *Dana*, 338.   The right to tax a bank is distinct from the right to tax stockholders.   1 *Nott & Mc-Cord*, 527.   2 *Baily Rep.* 656.

The case of 4 *Wheat.* 316, gives an exception to the general rule of exemption.

A tax upon stock is paid by the individual owner, and not by the bank.

3. That even if the contract should be construed to exempt the real and personal property of the old banks, and the property of the stockholders therein, yet such exemption does not

extend to the new banks or those chartered since 1830; and moreover, that the power of revocation, in certain cases, in these charters, reserves to the State the power of passing the general assessment law.

4. That the imposition of a tax of 20 cents upon every $100 worth of property, upon both the old and new banks, under the said assessment law, is neither unequal, or oppressive, nor in violation of the Bill of Rights.

5. That taxation upon property within this State, wherever the owners may reside, is not against the Bill of Rights.

The 13th section of our Bill of Rights is a limitation of the power to tax, and not a grant of the taxing power. It is not forbidden to tax non-residents. 4 *Wheat.* 428. 4 *Peter,* 564. 1 *Nott & McCord,* 527.

There was no period when the real property of non-residents was not taxed. 1781, *chap.* 4. 1785, *chap.* 83.

MEREDITH, for the Banks.

The banks repelling the tax stand on different grounds. Those before 1830, nine in number, stand on the ground of contract created by the act of 1821. The stockholders occupy the same ground. Those since 1830 place their defence on the act of 1835, which they say, is a contract or equivalent to a contract—a grant of an immunity as extensive as that yielded to the old banks by the act of 1821.

In regard to the old Banks four questions include the whole controversy—

1. The meaning and true interpretation of the contract of 1821?

2. If that contract amounts to a total exemption or *relinquishment* of all power of taxation, was the Legislature of Maryland competent to conclude it?

3. Was the contract in full force when the act of 1841 passed, or was it affected by the act of 1834?

4. If in full force, did the act of 1841 impair it? and I conclude from this, that if the act of 1841 did impair it, it was void.

I do not propose to argue the second question. It is no longer open. It is decided by the *State of New Jersey vs. Wilson*, 7 *Cranch*. No struggle can distinguish that case in principle from my second proposition. *New Jersey* parted with the power of taxation over certain lands in her territory as effectually as the Colonial Government of the same had parted with it. In the case of the *Providence* Bank, the same principle was maintained. Where a valid contract has passed between a State and a corporation, the courts will not say it is not competent to a State to relinquish the power of taxing for a valuable consideration. Where is the objection to the exercise of this power? What is an exemption? It is a franchise; it is an immunity. An immunity from taxation is no more nor less than a franchise. All charters, to all companies, are exemptions. Franchises conferred are a part of the Eminent Domain. It is said this is a tremendous power. But is that an argument to a court of justice? Possibility of abuse is no argument to establish the non-existence of a power. All power is discretionary; it may be illy directed. The responsibility is on the Legislature. They may call on their courts to correct all abuses of power. The decisions are conclusive on this point.

*First Question.* What is the meaning and interpretation of the eleventh section of the act of 1821? What creates the contract on which we rest? It is the grant of a total exemption, whether of the franchise, or of all the property held by the corporations in this State. Our opponents say it merely exempts the franchise. They admit to some extent at least, the power has been relinquished. To what extent I am now about to discuss. It is a question of great importance—of constitutional law always important—the decision of which may seriously affect the financial concerns of *Maryland*. It also affects important interests of corporations and individuals. You are not to look to the present condition of the State, though compelled to summon to her assistance all her aid. If she has the right, let her have all the benefit to redeem her violated faith; but I trust a still greater stain may not be affixed to this

State, by again violating her faith upon another sacred point.

The eleventh section of the act of 1821 contains a contract. In a statute we are to be governed by the intent on its face. We collect the intent from the words of plain, unequivocal import. Where there is no ambiguity you proceed no further. Ambiguous words may drive you to other laws. If the language is significant, the courts may not go out of it in search of intention. *Dwar. on Stat.* 9 *Law Library*, 51. In the absence of express words, or a strong implication, the court will not presume a grant. With these rules to guide us let us come to the language of this eleventh section. It pledges the faith of the State, on the banks complying with that law, not to impose any *further* tax or burthen on them. The whole stress of the argument turns on the meaning of the word *further* in this connexion. What is it in common parlance? No further injury—does that mean that one will do no further injury of the same kind? Rather is it not—no further injury of any kind. This word is used for additional. It is often used as a substitute, for additional—for other, in that sense I apply it. It is said further burthens refer to burthens of the same species, and that the latter words are to be supplied. It is said the contract to exempt is not to be extended beyond that interpretation. To which we reply, the road was agreed to be constructed, and was constructed, and a school tax agreed to be paid for the extension of the charters, with the clause of exemption—an extension for twenty years with an exemption, provided the banks would build the road and pay the school tax—and we must look to the act itself, and not to the votes and proceedings of the Legislature which led to its adoption, for its true meaning. The construction given to the word further leads to absurd conclusions. None could anticipate that the Legislature would impose further burthens of the same kind, to the price paid for those extended charters. The contract is admitted to be inviolate. None could anticipate that the Legislature would encroach on the Constitution. As to any argument derived from the practice of the bank, and their payment of other taxes—if this was wrong, acquiescence in the

wrong cannot make the act of 1841 a constitutional exercise of power.

A tax under the Bill of Rights must be uniform, and must be imposed for political purposes.

*Third Point of Appellant.* The act of 1834 is prospective in its provisions. It contains a grant from the expiration of the charter under the act of 1821. It protects the banks and recognizes the act of 1821. It gives an equivalent for banks relinquishing the faith of the State, not to object to further grant of banking privileges in *Baltimore.* The act of 1835, is a recognition of the existence of exemptions under the act of 1834, and extends them to the new banks. If the exemption of 1821 is total, constitutional, unaffected by the act of 1834, then, by the act of 1841, imposing a tax on the real and personal property of those banks, and their stockholders, is the contract of 1821 affected? As regards the banks themselves, there can be no question about it. The act of 1821 was a contract between the State and the banks. If the exemption was total, the real and personal property of the banks come within it—upon its true construction both are exempted. If the exemption be partial, there is an end of the cause.

What is a bank with reference to the capital of the institution? The capital stock is under the sole control of the directors. The stockholders have no control there; they are only entitled to dividends, profits made by the capital. Whatever portion of the capital a stockholder has paid, it must endure to the end of the charter. He has only residuum. The corporation is a trustee for the stockholders, for each and for all. An agent with power to contract; to bind the stockholders collectively. All its acts are those of an agent, and they enure to the benefit of every and each stockholder. The tax of 1841 is on property. The capital stock of a bank includes all its property; each stockholder has only a residuary interest. The exemption then protects capital stock or it affords no protection at all. The act of 1841 taxes such capital. The Legislature so understood it. Now the power to exempt is contested, yet the Legislature claimed that right in 1821. If it

exists, the act of 1841 is an infraction of it, and to say that a tax on property is not a tax on stock, and hence no infraction of the exemption, is an evasion unworthy of the State.    It destroys the whole value of the exemption.    7 *Dana*, 338.

The intention of the Legislature as to the new banks, is manifested in the act of 1835, chap. 142, the preamble and first section.    The ruling principle was to bring about equality between them and the elder institutions.    It is said the act of 1821 is repealed; we say it is irrepealable.    An executed contract which cannot be touched.    13 *Connec.* 87, 95.

With regard to non-resident stockholders, the language of the thirteenth section of our Bill of Rights is as explicit as words can well be.    The person taxed must be in the State.    The property and person must both reside in the State.    That concurrence is essential to the taxing power.    The acts adverted to by my opponents do not impose taxes on non-residents.    It does not appear that in their application, they included non-residents.    In the *Kentucky* case the stock of non-residents was not held liable to tax, and the policy of taxing them in *Maryland* has been greatly exaggerated.    It would hardly diminish the capital of the State.    For if foreign capitalists are not taxable, they would be induced to throw in more funds here, of which the public would reap advantage in another form.    The act of 1841, chap. 23, sec. 17, imposes a tax on non-resident stockholders, and obliges the banks to pay it. This is making one man pay the debt of another.    Makes the bank assume the validity of the law, pay on the strength of it, and take the chances of recovery back.    A regulation which has no sanction under our Bill of Rights.

J. MASON CAMPBELL for the *Chesapeake* Bank.

After referring to the 13th section of the Maryland Bill of Rights, maintained, that our constitution did not contemplate taxing property or persons beyond the State.    The *situs* must be within the State.    Jurisdiction, and the right to tax, were co-extensive, and the State could not tax beyond its jurisdiction.    The stock of non-residents in our chartered banks, hence, could not be taxed.

Next in point of fact, a double tax has been imposed upon the banks. All their real and personal property is taxed, and the shares of the capital stock are also taxed. Now with reference to the charter of these companies, the manner of their creation and organization, a tax upon their property, and the shares of stock in them, is in point of fact a double tax. The dividends of such institutions are no tests of intrinsic value. These depend on temporary circumstances. There may be no dividends. The purchaser, to determine the value of stock, looks behind the shares; he looks at that of which the shares are the representation—the property of the corporation. He regards the general condition and value of all the property, and from these deduces value of shares. He considers shares and property as identical, and not two distinct subjects of property of different values. They combined have but one value. The stock is the representative of the value of the whole property of a corporation. Every corporation has a distinct object, no matter what. When the Legislature creates it, the capital is paid in, but it is soon converted into the objects for which it was created. The money is transmuted into the objects of the corporation. Let a rail road for instance be wound up— that is a test. What is the subscriber's right. Make a dividend among share-holders, and each would get one-twenty thousandth part of a road. Money value of stock must be dismissed from our ideas. 4 *Peter*, 562.

In such cases there is no new creation of property; it has only changed hands. Individuals have surrendered their money; contributed it ; put it into a common reservoir—where is the property ? There exists in such case but one species of property ? Who has the actual worth ? In this respect a corporation is the similar of a partnership—one flows from the law, the other from the act of the party.

The power to exempt from taxation is not expressly granted to the Legislature ; but the taxing power is fully given as to persons and property within the State ; to exempt them is but the repression of that authority. The State has all power over the subject but what is denied, and to make a case of want of

power to exempt, the denial of such power must be shown in the constitution. *New Jersey, Massachusetts and Connecticut,* all exempt particular subjects from taxation. It is a question entrusted to legislative discretion. 7 *Cranch,* 165. 2 *Pick.* 403. 7 *Pick.* 110.

The power to exempt, frequently exercised by the Legislature of *Massachusetts.* 1779, 80 ; 1794, *chap.* 33 ; 1794, *chap.* 66 ; 1796, *chap.* 17.

The act of this State, of 1821, chap. 191, contains many exemptions from the taxing power; the soldiers' lands in *Allegany,* in their hands or in the hands of their descendants, were exempted.

Upon the *appeal* of the Appeal Tax Court from the refusal to assess certain property of the *Baltimore and Susquehanna Rail Road Company.* "It was admitted, that the rail road com-
" pany had conveyed to the State of *Maryland* all its lands and
" tenements, capital stock, estates and securities, and goods
" chattels, property and rights, now or at any time hereafter to
" be acquired ; and the nett tolls and revenues of the com-
" pany, as an indemnity to the State against the obligations un-
" der which the State has come, on account of it, amounting
" to $2,227,151.65, and the interest payable by the State
" thereon.

"It is further admitted, that at the time of the passage of
" the tax act of 1841, there was a large sum due by the com-
" pany for such interest paid by the State on its account ; that
" such sum on the 1st December, 1841, amounted to $279,-
" 590.84."

Upon the appeal by the same court against the *Chesapeake Bank,* it was agreed that the record should be amended by a statement of the manner in which the stocks held by the bank (the assessment of which was refused below,) are owned by it, whether as its property or as securities for monies loaned by it. If held in the latter capacity, the State does not claim to tax it.

Upon the appeal of the same court against the *Neptune Insurance Company,* it was agreed, that the stockholders in this

company have been individually taxed for their shares of the capital stock of the company, and that the stocks sought in this case to be taxed, are the property of the company absolutely.

Upon a similar appeal against the *American Life Insurance and Trust Company*, it was agreed, that the stockholders therein had been individually taxed for their shares of the capital stock of the company, and that the stocks sought in this case to be taxed, are the property of the company absolutely.

STEELE, D. A. G., on behalf of the State in those cases where the Appeal Tax Court had refused to tax stock in certain corporations belonging to certain other corporations, as corporate property. As to the stock owned by the *Susquehanna* Rail Road in the Citizens Bank of *Baltimore*, he maintained that the mortgage by the company to the State of all its funds did not alter the question. The debt is due the State, and the tax is beyond the debt. The property mortgaged is not the State's, she has only a lien on it; and he maintained—

1. That the bank stock exempted from taxation by the official tax court, is not included within any of the exceptions of the 1st section of the act of 1841, chap. 23, and is liable to be taxed under that act. The terms, judgments, &c., or other securities belonging to any bank or other incorporated institution, the capital whereof is taxed, did not exempt the *Susquehanna* Rail Road Company; that company was not one of the *"other incorporated institutions"* designed to be exempted. Those words in this clause allude to those other institutions expressly mentioned in the first section of the act of 1841, as incorporated literary or charitable institutions, county schools, &c., and hence a rail road company was not within the excepting clause. The Legislature had in view either those other corporations named in the law, or corporations of a kindred character with the banks; neither does bank stock come under the head of other securities in that connexion; it did not mean to except bank stock belonging to any bank or other company. 10 *G. & J.* 308.

2. Upon the true construction of the act of 1827, chap. 72, the said bank stock is not exempt from taxation. It was not invested for the purposes of the company. By the 20th section of the charter, the object of which was the construction of a rail road from the city of *Baltimore* to the river *Susquehanna,* it was declared that, "*that the shares of the capital stock of the* " *said company shall be deemed and considered personal estate,* " *and shall be exempt from the impositions of any tax or bur-* " *then, by the State's assenting to this law.*"

Under this clause the company cannot claim exemption from tax except on their capital stock. If the same property exists in two distinct forms, an exemption from tax in one form does not exempt it in the other form. Bank stocks are not shares of or in rail roads, hence it cannot be exempted. In *Wildman vs. Wildman,* 9 *Ves. Jr.*, 177 a distinction was taken between a transfer of stock and payment of money to a married woman. It survives to her. The interest in stock is nothing but the right to receive the dividends perpetually.

3. The Legislature had no power to except the property of the appellees from taxation.

J. MASON CAMPBELL for the *Susquehanna* Rail Road Company, insisted upon the converse of the points raised by the State, and maintained, that from the Bill of Rights in 1776 to 1841, no tax laws had passed in *Maryland* without exemptions—*contemporanea expositio, forti issime est in lege.*

By the act of July 1779, chap. 6. An act for Naturalization. Section 6, it was enacted, that no tax should be imposed on any foreigner, tradesmen, artificers and manufacturers, coming into this State and taking the declaration aforesaid, or his property, for the term of four years after his arrival.

By the act of March 1780, chap. 25. A supplement to the act for the assessment of property within this State. The taxes might be paid in money, certificates, or in cattle.

By the act of 1788, chap. 7. The Legislature loaned *Amelung,* a glass manufacturer in *Frederick* county, who had in his employment three hundred and twenty persons, one thou-

sands pounds, and granted him an immunity from taxes for six years.

By the act of 1792, chap. 71. An act for valuation of real and personal property within this State. Various exceptions were made from the taxing power.

The act of November 1793, chap. 79 excepts, property belonging to this State, or the United States; houses for public worship; burying grounds; property belonging to any county, college or county school; crop and produce of lands in the hands of the cultivator; provisions for family use; plantation utensils; working tools of mechanics and manufacturers; wearing apparel; goods, wares and merchandizes; all home made manufactures in the hands of the makers; all stills; all ready money; all grain and tobacco; all licensed vessels above twenty tons burthen, from valuation and assessment. And there are further exceptions in the acts of 1797, chap. 89; 1803, chap. 92; 1812, chap. 193. There has never been a general tax law without exemptions of some sort; and see 3 *Bland*, 253, 258, 264. The fact of exemption has gone hand in hand with the taxing power. I refer to this case particularly, for to every one acquainted with the thorough manner in which the Chancellor examines and exhausts every subject he takes up, it is unnecessary for me to say that he has collected all the laws on this subject. Treble taxes were laid on non-jurors. Under the 13th section Bill of Rights, the Legislature has exercised ordinary, extraordinary, and exempting powers of taxation. They have a right to discriminate with a political view. This makes an exemption. Taxes and punishments are followed often by penalties and bounties. Penalties and bounties are incidental to sovereignty. Religion was to depend on individual efforts, and hence no property so applied was exempted. And when a great political object was to be achieved through the rail road company, at private expense, another exemption was granted.

This property ought not to be taxed, because the State is owner as mortgagee.

CONSTABLE and HOWARD in reply for the Appeal Tax Court cited—12 *Mass.* 252; 11 *Peters*, 644, 659; 4 *Peters*, .168.

This case involves the question, whether mortgagors having thrown the legal title on the mortgagee, can also cast with it the burthen of taxation. It is a new principle, and it seems to us an invasion upon the law of mortgage, and the relations of the parties. The mortgagor is entitled to his interest without deduction, and the mortgagor who continues to reap the profits ought to pay the taxes. This court cannot foreclose the mortgage and cut off the mortgagor's rights. 6 *Connec.* 230; 7 *Connec.* 339.

Upon the appeal of the Appeal Tax Court, as representing the State, in the refusal of that court to tax various stocks held by corporations, banks, and insurance companies, whose capital stock had been taxed—

STEELE, D. A. G., for the State.

1. The State does not claim to tax stock held by the banks as a security for debts due them, but maintained that all other stocks held by them did not come within the exceptions of the act of 1841, chap. 23, sec. 1, and are liable to taxation under that act.

2. The tax in question is not a double tax, and therefore no violation of the 13th article of our Bill of Rights.

McMAHON, for the *Western Bank.*

This corporation holds property as agent for individual stockholders, and the State cannot tax the principal and agent at the same time. The agent may present the question if the principal is taxed. He may show who ought to be taxed, or that it has been laid upon the other party. If twice taxed, the stockholder may raise the question. Where the court cannot see the fact, they will permit the corporation to show the existence of a double tax, and repel it. Is there any such principle as a double tax in the Bill of Rights? This we deny. If I sell my title to an individual, and take his note, and yet

hold my property, I am not to be taxed as holder of the property, and also upon the note. A double tax is a tax falling twice on same interest. 2 *Kent*, 331. All taxes should be equal. Equal taxes are demanded by our Bill of Rights. It denies the right to a double tax in all cases. Acting on the same property in any mode it is wrong. In the case of a hogshead of tobacco in the warehouse, represented by a certificate, which is a sort of currency, the evidence of its deposite, the tobacco and certificate cannot both be taxed. The declaration in the Bill of Rights, that every person ought to contribute according to his actual worth, means, must so contribute. This is the organic law; not a discretionary power, but a binding rule. A tax on the stock is a tax on the whole property of the corporation, and it is not to be re-taxed as capital. The stock includes all the property. The stockholders represent the whole property united, hence the corporation and share-holders are not both taxable. The Legislature by their exemptions show they did not mean to impose a double tax. They did not tax debts due the bank, which might be laid on an amount far beyond the capital—that would include the credit also. Hence a large amount beyond capital is expressly exempted. The representative and the thing represented cannot both be taxed.

MAYER, for the *Neptune* and the *American Life Insurance and Trust Company*.

For all the purposes of property, a court of law will regard a corporation as a mere association of individuals. Where justice requires it, the courts will resolve a corporation into its individuality. Corporations for the purposes of convenience, are authorised to sue in certain forms. In the creation of a corporation the State parts with no portion of her sovereignty. By that act her sovereignty is not impaired; nor is its property to be treated, as other, than the property of individuals. 4 *Peters*, S. C. 546, 562. 5 *Cranch*, 61. 7 *Wheat.* 553. Hence a tax on stock and corporate property is a double taxation, and not admissible.

The non-residence of the stockholders of the American Life and Trust Company exempts them from taxation.    16 *Pick.* 573.

HOWARD for the State maintained, that as to all stock purchased after the passage of the act by the companies, the tax thereby imposed could not be considered a double tax.    The stock had been previously taxed, and the tax imposed upon the same stock in the hands of a new proprietor, cannot be treated as a double tax.

GEO. M. GILL upon his appeal—maintained in this case, the tax was levied upon all his possessions for State purposes, without any regard to his actual worth in real and personal property, with no deductions for large sums due by him on mortgage, while the sums due him in that mode were assessed ; that the same rule being observed both in the county and city taxes of *Baltimore,* it fell upon him in fact in a three-fold ratio. No such practice was legal under our Bill of Rights.    Standing upon the act of 1841 alone it might be defended, but under the 13th section of our Bill of Rights, every citizen must contribute only according to his actual worth.    Now *actual worth* can only be ascertained by deducting what a citizen owes from what he possesses.    The words actual worth are of the most essential import in this clause, and give a peculiar meaning— a controlling meaning to the whole clause.    Actual worth is contra-distinguished from imaginary or fictitious worth.    It was a general system laid for the support of government, not a license or a temporary rule, but a general tax to pay debts; and I maintain, that the sums due on mortgage should be deducted from the sums claimed on mortgage, to and by each citizen, otherwise fictitious, and not actual worth is taxed.    ·

STEELE, D. A. G., replied.    The State looks to the ownership of each species of property.    Money due on mortgage is taxed in the hands of the creditor.    It is property which produces an annual profit.    The law does not tax the worth of a citizen, but the specific property of which he is owner, with-

out any reference to his liabilities. In this view the act of 1841 is no violation of the Bill of Rights.

DULANY for the *Washington College* and *Dr. Samuel K. Jennings*, maintained—

1. That the tax imposed upon the Washington College by the assessors, is wholly unauthorized by the act of 1841, chap. 23, on the contrary, the first section of said act, and in the proviso thereof, colleges are exempted.

2. The tax upon the judgment against the college property, confessed in favor of *Dr. Jennings*, was for the benefit of the college itself; and that the money obtained thereupon was applied to the erection of the college, and that therefore the tax upon the said judgment is virtually a tax upon the college itself, which it will have to pay, and is therefore unauthorized by the said act, for the reasons aforesaid.

STEELE, HOWARD and CONSTABLE for the Appeal Tax Court, maintained—

1. That the Legislature had no right to exempt the property of Washington College from taxation.

2. That the judgment of *Dr. Jennings* against said college, is taxable under the act of 1841, chap. 23 ; he standing upon the facts disclosed in the record as an ordinary judgment creditor of the college, and their being no exemption in said act given to creditors of incorporated literary institutions.

Upon the appeal of the *Savings Bank of Baltimore*, that bank filed the following statement :

*To the Appeal Tax Court :*

The *Savings Bank of Baltimore* appeals from the return of the assessors, and claims to be exempt from taxation on the property in the possession and care of said bank, on the ground that being merely a bank of deposit, having no stockholders or fixed capital, is itself free from liability to taxation on its deposites, and consequently is exempt from taxation on property which is merely lodged with it as collateral security for its loans, or held as investments of deposites, subject to be

withdrawn at pleasure; which loans and investments are merely the representatives of the deposites.

The bank also objects to the assessment of property in its name, on the ground that said property being temporarily held as security for loans, and not owned by the bank, is property assessable to the individuals to which it belongs; to which individuals it is fairly to be presumed, (as the bank conceives,) it must have been assessed.

The bank considers itself as only bound under the law to return a list of foreign stockholders, none of which it has, having in fact *no* stockholders.

J. Cushing, <em>President S. B. B.</em>

*November 30th,* 1841.

Upon this appeal, McMahon for the bank filed the following points :

The appellant will contend, that the decision of the tax court assessing the stocks held by it as securities is erroneous, and ought to be reversed.

1. Because, as the stocks are held by the appellant as securities for money lent, the party pledging the stock to secure the loan, is within the contemplation of tax act, the owner of the stock, and liable to the tax on it, and not the pledgee, the appellant, who is only liable, if at all, on his loan.

2. That the appellant being an institution incorporated solely for the purpose of receiving and investing deposites made by individuals, and the securities which it holds being mere investments of such deposites, for the benefit of the depositors, are liable under the act to a tax on their deposites, (being money at interest,) and that therefore, the tax on the securities which are taken to secure its investments of said deposites, operates as a double tax on the depositors, and is contrary to and forbidden by the Bill of Rights of this State ; and also by the intent and equity, if not the letter of the exceptions of the first section of the tax act.

Upon further consideration, however, the counsel for the Savings Bank dismissed this appeal, and the questions raised were not argued or decided.

In the case of the appeal of the *Philadelphia, Wilmington and Baltimore Rail Road Company vs. The Commissioners of Harford county*, the parties by their counsel filed the following agreement as a part of the record in that case:

"The Philadelphia, Wilmington and Baltimore Rail Road Company was formed by an agreement of union, duly made and entered into between the following corporations, to wit: The Baltimore and Port Deposite Rail Road Company, "The Wilmington and Susquehanna Rail Road Company," and The Philadelphia, Wilmington and Baltimore Rail Road Company (of *Pennsylvania*.) This agreement of union was made on the day of its date, under the authority claimed under, and in pursuance of the directions of the several acts of Assembly therein recited; and was entered into after the primary meetings of stockholders as required by said several acts; and was certified and recorded as required by said several acts. A copy of said agreement is herewith produced as a part of this statement, marked exhibit A. Copies of said several acts are also herewith filed as a part of this statement, marked exhibit B.

"The Baltimore and Port Deposite Rail Road Company was incorporated by the act of 1831, chap. 288, of the General Assembly of *Maryland*, which act and the several supplements thereto, are intended to form a part of this statement. The Wilmington and Susquehanna Rail Road Company, (one of the parties to said agreement marked A,) was formed by an agreement of union, duly made and entered into on the 18th April, 1835, between the Delaware and Maryland Rail Road Company, and the Wilmington and Susquehanna Rail Road Company, (of *Delaware*,) in virtue and in strict pursuance of the several acts in said agreement of union recited; and was certified and recorded as directed by said several acts, a copy of which last mentioned agreement of union, herewith filed as a part of this statement, marked exhibit C. The said corporation, the Delaware and Maryland Rail Road Company, was incorporated by the act of 1831, chap. 296, of the General Assembly of *Maryland*, which act and the several supplements

thereto, are intended to form a part of this statement. The Wilmington and Susquehanna Rail Road Company (of *Delaware*,) was incorporated by an act of the General Assembly of the State of *Delaware*, passed on the 18th day of January, 1832, which act and the several supplements thereto, are intended to form a part of this statement, copies of which are herewith filed, marked exhibit D. The Philadelphia, Wilmington and Baltimore Rail Road Company (of *Pennsylvania*,) was originally chartered by an act of the General Assembly of the Commonwealth of *Pennsylvania*, approved on the 2nd day of April, 1831, by the name of "The Philadelphia and Delaware County Rail Road Company," which, by a supplement to said act, passed the 14th day of March, 1836, was changed to the corporate name of "The Philadelphia, Wilmington and Baltimore Rail Road Company," which said acts, and the acts supplementary thereto, are intended to form a part of the statement, copies whereof are herewith filed, marked exhibit E.

"The map, herewith filed, marked exhibit F, is a correct and complete profile of the rail road of the Philadelphia, Wilmington and Baltimore Rail Road Company, in its whole extent, and is intended to form a part of this statement. That portion of said Rail Road which lies west of the *Susquehanna* River, that is to say, between the city of *Baltimore* and the River *Susquehanna*, lying partly in *Baltimore* county and partly in *Harford* county, was made and constructed, (prior to the agreement of union, of which exhibit A is a copy,) was owned in severalty, by Baltimore and Port Deposite Rail Road Company. That portion of said rail road which lies east of the *Susquehanna*, and between that river and the divisional line between the State of *Delaware* and the Commonwealth of *Pennsylvania*, was made by the Wilmington and Susquehanna Rail Road Company, and (prior to the said agreement of union, of which said exhibit A is a copy,) was owned in severalty by said last mentioned company. Previous to the consolidation of the Delaware and Maryland Rail Road Company and the Wilmington and Susquehanna Rail Road Company, (of *Delaware*,) into one company, the line of the road which the said

corporation, "The Delaware and Maryland Rail Road Company" was authorised to make, was that part of said road which lay east of the *Susquehanna*, and between that river and the divisional line between the States of *Maryland* and *Delaware;* and that part of said road which the said corporation, "The Wilmington and Susquehanna Rail Road Company (of *Delaware*,) was authorised to make, is that part of said road which lies between the divisional lines of the States of *Maryland* and *Delaware*, and the commonwealth of *Pennsylvania.* Each of said last mentioned corporations, prior to their consolidation, had commenced the location and construction of their said several parts; but at the time of the union under the agreement, of which exhibit C is a copy, neither part was completed; but the whole was completed by the Wilmington and Susquehanna Rail Road Company, after the agreement of union, of which said exhibit C is a copy. The river *Susquehanna* is passed over by the use of a steamboat belonging to the appellant, and used by the appellant for the sole and exclusive purpose of transporting persons and property across said river from shore to shore, from the terminus of the rail road track, on the other shore—said steamboat is specially constructed for its use in connection with said rail road, and has rails laid on its upper deck, which are so constructed that the said rails are placed in juxta-position with the rail road track of the rail road; when the boat is in place for use in connection with the terminus of the road on either shore, on that, cars are received upon the said deck of said steamboat from the rail road track on one shore, and passed over the river by the said steamboat—and on to the rail road track on the other shore from off said boat, as the means of passing cars, &c., across the river; and prior to the agreement of union, of which exhibit A is a copy, was owned jointly, but in unequal parts, by the Baltimore and Port Deposite Rail Road Company, and the Wilmington and Susquehanna Rail Road Company, and was managed and kept in repair at the joint expense, in the proportion of their respective interest therein, by the said last mentioned two companies. The said steamboat before

and since the said agreement of union, of which exhibit A is a copy, usually remained, and still usually remains, in a dock constructed in the *Susquehanna* river, by protecting piers projecting from the *Harford* shore, when not actually in use; which dock is within the limits of *Harford* county. That part of said road which lies east of the divisional line between the State of *Delaware*, and thence extending to the city of *Philadelphia*, was, prior to the said agreement of union, of which exhibit A is a copy, constructed and owned in severalty by the said corporation, called, The Philadelphia, Wilmington and Susquehanna Rail Road Company, (of *Pennsylvania*.) The The principal office of the appellant, (ever since the agreement of union, of which exhibit A is a copy,) for the transaction of the business of said company, has been established and held in the city of *Philadelphia*, at the eastern terminus of said rail road. The stated meetings of the board of directors, by the terms of said agreement of union, are to be held alternately at *Wilmington* and *Philadelphia*. There are offices at *Philadelphia, Wilmington* and *Baltimore*, at any one of which transfers of stock may be made. The stated meetings of the stockholders are to be held in the city of *Wilmington*. Prior to said agreement of union, the principal office of the Baltimore and Port Deposite Rail Road Company was held in the city of *Baltimore*. All the corporate funds and capital stock of said appellant have been expended and consumed in the location and construction of said road, and in the construction of such works and improvements as were necessary and expedient to the proper completion and use of said road, and in the purchase of cars and machinery of transportation, &c., necessary and indispensable to the completion and use of said road; and that the said company has not, at any time, since the said agreement of union, owned or held, and does not now own or hold any estate, real, personal or mixed, other than what forms a part of, or necessarily appertains to, the construction and completion of said road, and its works and improvements, and in the purchase of cars and machinery of transportation, &c., necessary and indispensible to its use; and that over and

beyond its actual capital, it was found necessary to raise by loan a large additional amount for the purposes aforesaid, and which amount has been so applied. The appellant has been assessed under the said act by the assessors of *Harford* county, whose assessment was confirmed, on appeal, by the commissioners of *Harford* county, with the sum of $127,000, as shewn by the valuation filed in this case. The several parcels or tracts of land, valued at 200 acres, at $10 per acre, as held and occupied by said company from the *Gunpowder* Falls to the *Susquehanna* River, lie within the limits of *Harford* county, and consists of the land held and occupied by said company, portions of which were acquired under condemnations for the use of said company under the provisions of the said act of 1831, chap. 233, and other portions of which were acquired by agreement with the owner for the bed, water stations, depots, and ticket offices of said company. The title acquired in each case of agreement with the owner being consummated by deed of bargain and sale to the president and directors of said company and their successors, in the ordinary terms of a conveyance in fee. The houses and other improvements on the road and at *Havre de Grace*, are the depots, ticket offices, and water stations, of said company, within the limits of *Harford* county. The rail road track iron, within the limits of *Harford* county, valued at $95,000, consists of the rails actually laid down and in use as the track of said rail road, within the limit aforesaid. And the steam ferry boat at *Havre de Grace* is valued at $15,000, is the steamboat hereinbefore mentioned, used as aforesaid, for the sole and exclusive purpose of transporting persons and property across the river *Susquehanna*, from the terminus of the rail road track on one shore, to the terminus of the rail road track on the other shore, in the manner hereinbefore mentioned, said steamboat is, and continually since its use as aforesaid, has been duly enrolled and licensed at the Custom House in *Baltimore*, according to the act of Congress. The capital stock of the appellant, under the agreement, is divided into 45,000 shares of $50 each; and which stock is held by various persons, many of whom

reside in the State of *Maryland,* and others of whom, and a large majority of whom reside in other States, and in *Europe,* and was so held at the time of said union.   The stockholders residing in the city of *Baltimore* in *Maryland* had actually been assessed to the extent of the stock by them respectively held, no objection being taken to said assessment, nor any appeal prosecuted therefrom, no assessment has been made on the stock of any of the stockholders residing in *Harford* county or *Cecil* county, if any reside there, nor on the stock of non-resident stockholders.

OTHO SCOTT and W. SCHLEY, for the *P., B. and W. Rail Road Company.*

The appellants, in support of the appeal in this case, and to shew that it, in its corporate capacity, is not liable to be assessed in respect of said land and other property, or, if liable to be assessed at all, not to the extent, or on the principles on on which said assessment was made, intends to rely upon the following points—

1. That by the act of March session, 1841, chap. 23, no property of any description was intended to be burthened, directly or indirectly, with the imposition of a double tax.

2. That by the same act, the *capital stock* of the appellant, (if not exempt from taxation,) is made liable to the tax thereby laid, and is to be valued and assessed in the names of the respective stockholders, and as the individual property of said stockholders ; which stock fully and effectually represents the rail road of the appellant, and all necessary works therewith connected and indispensable to its use ; and so represents the said land and other property assessed by the said assessors to this appellant, in its corporate capacity ; so that if said assessment be not corrected, the said property will, in effect, be subjected to a double tax, contrary to the intention of said act, and against the principles of the Bill of Rights.

3. That the said rail road and its necessary works therewith connected and indispensable to its use, are vested in the appellant, in its corporate capacity, *in trust,* for public use and

subject to the right of the public to use the same, in the manner and on the terms prescribed by law, so that the appellant, in its corporate capacity, has no beneficial ownership in said road, as real property corporeal, and is not liable to the payment of any tax assessed thereon, as real property corporeal; and therefore is not liable to the assessment made in its name by the said assessors.

4. That the appellant has no beneficial right of property in said rail road and its necessary works therewith connected and indispensable to its use, except the right to demand and receive the *tolls* thereby allowed, for the transportation of passengers and property over and along the same; so that if the said appellant, in its corporate capacity, is liable to be assessed at all in respect of its property in said road, it ought to be assessed not with the value of the *corpus* of said road or any part of said *corpus*, but in respect of the value of its *franchise*, or incorporeal right to demand and receive tolls as aforesaid.

5. That the appellant, if taxable at all, is taxable only, under the provisions of said act, in the city of *Baltimore;* inasmuch as its principal office is there established, and the western terminus of its road is in that city also.

6. That the assessment was made upon an erroneous principle, in this, to wit: that whereas, said land, houses and other improvements, and rail road track iron, are permanently united and co-exist, as a rail road with necessary works indispensable to its use; yet the said assessors, for the purposes of valuation and assessment, have separated the said rail road and works into parts, and have valued the original constituent materials of said rail road in severalty; which is calculated to work partial injustice in its results, and is contrary to the provisions of said act.

7. That the said appellant, in its corporate capacity, if liable to any assessment in respect of its permanent and fixed works within this State, is only liable to be assessed in respect thereof, at the value of the land thereby occupied, qua land; and wholly independent of the value of said permanent and fixed works accruing from such improvement of said land.

8. That upon the true construction of said act of 1841, chap. 23, the appellant, in its corporate capacity, is not made liable to any tax or assessment in respect of its rail road and necessary works therewith connected, and indispensable to its use as a rail road, either as supposed owner of the *corpus* of said rail road and its works, or as owner of the *franchise* to demand and receive tolls, or in respect of its *fixed and permanent works*, in their improved condition; or in respect of the *land* occupied by said rail road and its works, at its rate of value qua land; or in any manner, or to any extent.

9. That upon the state of facts in this case, the said steamboat is not subject to assessment by the assessors of *Harford* county; and that the said assessment in this respect is erroneous, and unwarranted by law.

They cited 13 *Serg. & Low.* 334; 2 *Barn. & Ald.* 501, 571, 646; 4 *Paige*, 386.

STEELE, D. A. G., HOWARD and CONSTABLE, for the Commissioners of *Harford* county, maintained—

1. That the exemption from taxation of the shares of the company incorporated by the act of 1831, chap. 296, is void, as being against the declaration of rights and the Constitution of the State of *Maryland*, whether such exemption be claimed by the company incorporated by that act, or any other company formed by an union or junction with it.

2. That such exemption, if good, was not by any subsequent act of Assembly transferred to or vested in the appellant.

3. That if such exemption be not void, yet the reservation to the State of the power to tax the permanent and fixed works of the company, which are within the limits of *Maryland*, justifies and sanctions the imposition of the tax which is the subject of the present appeal.

BY THE COURT—

Ordered and adjudged, that the appeals of the resident and non-resident stockholders of the *Union Bank of Maryland*, (ante 121,) be *affirmed*, except as to certain incorporated literary and charitable institutions, and the *Union Bank*, which were *reversed*.

That the appeals taken in the name of the Appeal Tax Court, (ante 121, 122,) and from *the refusal of that Court* to assess certain stocks held by the *Baltimore Insurance Company*, and other insurance companies and banks in the corporations there enumerated, and by the *Baltimore and Susquehanna Rail Road Company* in the *Chesapeake Bank*, be affirmed.

That the appeal of *Geo. M. Gill*, (ante 122,) be affirmed.

That the appeal of *Charles F. Mayer*, (ante 122,) be affirmed.

That the appeal of *Washington College*, (ante 123,) be reversed.

That the appeal of *Dr. Samuel K. Jennings*, (ante 123,) be affirmed.

That the appeals of *Daniel Atler*, and various other stockholders of the *American Life Insurance and Trust Company*, be affirmed.

That the appeal of the *Philadelphia, Wilmington and Baltimore Rail Road Company*, (ante 123,) be affirmed.

That the appeals of the resident and non-resident stockholders of the *Farmers and Merchants Bank*, and the other banks enumerated, (ante 123, 124,) be affirmed.

DORSEY, J., dissented from the judgment of this court, affirming the appeals taken in the name of the Appeal Tax Court, (ante 121, 122,) in all cases in which that court had refused to assess the stock held by the insurance companies and banks, either in their own, or other corporations.